SALT LAKE CITY v. INDUSTRIAL COMMISSION et al.

No. 6568.   Decided August 3, 1943.   (140 P. 2d 644.)

See 71 C. J., Workmen's Compensation Acts, sec. 771; Workmen's Compensation Act, note 78 A. L. R. 1232; See also 28 R. C. L. 755 (8 Perm. Supp. 6201; Supplement 2847).

*A. Pratt Kesler, E. R. Christensen,* and *Homer Holmgren,* all of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen., *Herbert F. Smart,* Deputy Atty. Gen., and *Allen G. Thurman,* of Salt Lake City, for defendants.

WOLFE, Chief Justice.

Certiorari to review an award made by the Industrial Commission to C. B. Temple. Temple, who was employed by Salt Lake City as a fireman, filed an application on March 18, 1942, for compensation for the loss of his left eye. He alleged that while he was playing handball on October 22, 1940, he was struck in the left eye by a handball and that this blow caused sarcoma. The sarcoma necessitated the removal of the eye.

The evidence shows that Temple was employed as a fireman; that he worked 24 hours and was then off shift for the next 24 hours; that he was required by the employer to take exercise while on duty, and as part of this exercise the City encouraged firemen to play handball; and that, while playing handball at the station and while on duty, he was struck in the eye by a handball. This blow caused considerable pain and the eyeball became bloodshot. This injury apparently healed and all outward signs of injury disappeared in two or three weeks. He testified that in from one to six months the eye began to water and mucus would frequently collect in the corner of the eye. Temple testified that this watering of the eye continued for some six months, at which time he began to have difficulty in reading because his vision would blur. The field of vision was restricted so that he

was missing handballs because he could not see them with this eye when he should have been able to see them. This impairment of vision became worse. About 14 months after the accident he sought medical aid and was informed that there was a growth extending into the eyeball so as to block about one-half of the field of vision of that eye. Various doctors, after examining the eye, informed the applicant that this growth was sarcoma of the choroid and that the only possible treatment was the removal of the eye. The eye was removed in February, 1942, and at that time a laboratory examination confirmed the diagnosis that the growth was sarcoma.

The commission found that the

"applicant suffered an accident on October 22, 1940, in the course of his employment, and that said accident consisted of a blow by a handball on the right side of the applicant's left eye."

It also found that the injury suffered by the applicant at this time either caused the sarcoma or was the activating force which accelerated the growth of the sarcoma and necessitated the removal of the eye. At the outset, the City contends that the claim is barred by virtue of Sec. 42-1-92, U. C. A. 1943, because of the failure of the applicant to give the City notice of the accident and the injury within one year from the date of the accident. That section, so far as material here, provides:

"When an employee claiming to have suffered an injury in the service of his employer fails to give notice to his employer of the time and place where the accident and injury occurred, and of the nature of the same, within forty-eight hours, when possible, or fails to report for medical treatment within said time, the compensation provided for herein shall be reduced fifteen per cent; *provided*, that knowledge of such injury obtained from any source on the part of such employer, his managing agent, superintendent, foreman, or other person in authority  *  *  *  shall be equivalent to such notice  *  *  *. If no notice of the accident *and* injury is given to the employer within one year from the date of the accident, the right to compensation shall be wholly barred." (Italics added.)

The uncontradicted evidence discloses that Lt. Thompson, who was in charge of the fire station at the time the injury occurred, was playing handball with the applicant at the time the handball struck the applicant in the eye. At that time, Thompson knew as much concerning the cause and the nature of the injury as did the applicant. Thus under the statute the City had the equivalent of notice of the accident and some injury. However, the City contends that this was not sufficient notice. In so contending it urges that the statute uses the term "injury" to mean an injury which has resulted in a disability which will entitle the employee to compensation. Under such a construction of the section the employee would be required, within a year from the date of the accident, to give his employer notice of the accident and also notice that this accident had resulted in an injury which had caused a compensable disability. Often accidental injuries do not result in disability within a year. It thus becomes evident that what the City is really contending is that Sec. 42-1-92 limits compensation to those accidental injuries which result within a year in disability. Those injuries which do not result in loss of work, require medical attention, etc., until more than a year after the date of the accident would, under this construction, be excluded from the scope of the Act.

This section, however, cannot be so construed. We find no cases, and none are cited, which have given such a construction to statutes requiring the employee to give the employer notice of the accident and the injury within a prescribed period of time. But quite to the contrary the cases uniformly hold that such statutes were designed to give the employer an opportunity to make an early investigation of the circumstances surrounding the alleged accident and to assure him the opportunity of giving prompt and proper medical aid where it is deemed necessary. Such statutes also protect employers against fraudulent claims and give them an opportunity to remedy defects so

as to prevent similar accidents in the future. *Littleton* v. *Grand Trunk R. Co.*, 276 Mich. 41, 267 N. W. 781; *Hercules Powder Co.* v. *Nieratko*, 114 N. J. L. 254, 176 A. 198; *Kanga's Case*, 282 Mass. 155, 184 N. E. 380; *Burke* v. *Industrial Comm.*, 368 Ill. 554, 15 N. E. 2d 305, 119 A. L. R. 1152; *Armour & Co.* v. *Industrial Comm.*, 367 Ill. 471, 11 N. E. 2d 949.

We have held that the Industrial Act must be liberally construed and that by such construction we should attempt to effectuate its beneficent and humane objects. *North Beck Min. Co.* v. *Industrial Comm.*, 58 Utah 486, 200 P. 111. We therefore will not construe this provision, which was obviously designed to protect employers by requiring prompt notice of injuries and accidents, as a limitation on the scope and coverage of the Act. The plain language of the Act requires only notice of the "accident and injury."

In this case the employer had notice that the applicant had suffered an accident and some injury. It had ample opportunity to investigate the surrounding circumstances and to provide prompt and proper medical aid. It knew as much concerning the accident and the injury as did the applicant. We hold that the City had proper notice and that it was not necessary for this injury to become compensable within a year to come within the coverage of the Act.

The City also contends that (1) the injury did not arise out of or in the course of the applicant's employment; and (2) that if the applicant was injured in the course of his employment, there was not sufficient evidence to support the finding that the blow by the handball caused the sarcoma.

The first of these contentions is without merit. The evidence clearly shows that the applicant was required to take exercises while on duty. As part of this exercise, the City encouraged the men to play handball and provided them with a handball court for that purpose. The applicant was injured while thus playing handball.

We think that in view of this evidence the commission was warranted in concluding that the applicant suffered an accidental injury in the course of his employment.

The second contention raises a more serious problem. In an attempt to ascertain whether the blow to the eye caused the sarcoma or aggravated or accelerated a pre-existing sarcoma three medical experts were called. There was little if any conflict in their testimony. They all freely admitted that the medical profession does not know the cause of sarcoma.

Dr. Fairbanks was called by the applicant. He testified that the blow which the applicant received on his eye with the handball "possibly" created all of the conditions in the applicant's eye which necessitated its removal. He stated that almost every doctor who deals with sarcoma forms his own theory as to its cause. He was then asked:

"Do you have an opinion? Is it your opinion that the sarcoma in the applicant's eye which caused its removal was caused by trauma or blow? A. I feel like it.

"Q. Is that your opinion? A. An opinion has to be based on something fundamental, with proof. If I was going entirely on my own thought that would be my thought.

"Q. That was your belief? A. That was my belief, as I told you, based on nothing, because there is nothing to substantiate it in the literature at all."

Dr. Openshaw, who was called by the City, testified that he had had a great deal of experience as an industrial doctor with sarcoma and that it was his opinion that this blow had nothing whatever to do with the sarcoma. He did testify that trauma is sometimes listed by medical authorities as an activating cause of sarcoma, but that he, from his own experience, had concluded that trauma had nothing to do with sarcoma.

Dr. Ogilvie, the other medical witness called by the City, had also had much experience in the diagnosis of sarcoma. He testified that there is no universally accepted theory as to the causation of sarcoma. Certain individual types of tumors are caused by specific things. He stated that con-

tinuous irritation is generally recognized as one of the causes of sarcoma, but that it was his opinion that a single blow would not cause sarcoma of the choroid or aggravate or accelerate a previously existing sarcoma. He also stated that every once in a while one hears of a single trauma showing definite bridging symptoms so that authorities would conclude that the trauma caused bone sarcoma. A hypothetical question setting forth the bridging symptoms which according to the applicant's testimony might tend to connect the sarcoma with the blow which he received on October 22, 1940, was put to Dr. Ogilvie. In response he answered that under those facts he did not believe that the blow had any relationship to the sarcoma. The gist of Dr. Ogilvie's testimony in regards to the probabilities of this sarcoma being caused by the blow seems to be contained in his statement that,

"Coupled with what we know about the etiological causation of tumors, since we don't know what the causation is, then I would say it is possible, but coupled with the facts and what I know about the etiology I would say it is not probable."

Dr. Ogilvie also testified that it would take from three months to three years for a growth the size of the one in the applicant's eye to develop; that considering the date of the injury, the date the eye was removed and the size of the growth he would say the time element would be about right for the growth to have had its origin around the time of the accident. Dr. Fairbanks was also of the opinion that this growth had been developing for at least six months.

Those factors disclosed by the testimony of these experts which favor the position of the applicant may be briefly summarized as follows: The time element for the development of a growth of this size was about right. ■ The medical profession does not know the cause of sarcoma and because of this fact, none of the doctors was prepared to say that it was impossible for sarcoma to result from a blow. There is some medical authority adhering

to the view that sarcoma can result from a single blow, but none of the doctors who testified knew of a case where sarcoma had developed because of a single blow to the eye. Dr. Openshaw and Dr. Ogilvie both were of the opinion that there was no relationship between the sarcoma and the blow in this case. Dr. Fairbanks thought the blow did cause the sarcoma. However, his further testimony leaves us in doubt as to whether this belief in this regard was based on his own observations of this and other cases or whether it was based entirely on conjecture and surmise. Taken in its most favorable light for the applicant, the most that can be said for it is that it borders very close to the fringe of conjecture and would not by itself support an award. We must conclude that this medical testimony alone will not support this award.

The Commission apparently was of the same opinion, for it stated:

'In spite of all of the medical testimony, the Commission is still confronted with the problem of deciding whether the trauma caused or accelerated the sarcoma * * * were it not for the sequence of events which we think are rather convincing, we would be inclined to the view that trauma did not cause the sarcoma."

The sequence of events to which the commission referred were brought out by the testimony of the applicant. According to this testimony he was struck in the eye by a handball in October, 1940. At this time he suffered considerable pain, the eyeball became bloodshot, and the area around the eye became discolored. In about two or three weeks these outward signs of the injury disappeared. About a month after the injury the eye began to water and mucus would collect in the eye. Some six months later the applicant had difficulty in reading because his vision would blur. This impairment of vision became progressively worse. Within a period of a little over a year from the date of the injury, it became necessary to remove the eye because of this malignant growth.

In the case of *Utah Fuel Co.* v. *Industrial Commission,* 102 Utah 26, 126 P. 2d 1070, 1072, this court upheld an award based almost entirely upon a sequence of events which began with an injury to the employee's testicle on January 3, 1941, and culminated with the employee's death on May 3, 1941. The evidence showed that the employee bruised his right testicle on January 3, but continued working without loss of a working day. On January 14 he was forced by the pain to quit work. On February 1 he was hospitalized, and he died on May 3. The cause of death was diagnosed as "primary carcinoma of right testitcle with carcinomatosis." In upholding the Commission's award we stated:

"When the event of accident is definite and injures a particular member or part of the body and afterward disability or death occurs and the progression toward disability or death can definitely be ascertained as beginning with the former event because the history of the progression directly involves a worsening of the member or part to which the injury occurred or the evidence involves a connection between the trauma and other affected parts in the history of the progressive worsening, there will be sustaining evidence for an award."

The applicant relies on our holding in the Utah Fuel case in support of his position here, but it is doubtful that this case can on its facts be brought within the rule laid down in the Utah Fuel case. The bridging symptoms are not nearly so convincing in this case for after all outward signs of the eye injury had disappeared there was a period of from one to six months during which there was no trace of this injury. Then the eye began to water and the vision became impaired because of this malignant growth which eventually caused the loss of the eye.

Yet, even though these bridging symptoms are not so strong as those involved in the Utah Fuel case, they do have certain probative value. Here is a rather severe injury to the eye. Within six months a malignant growth had developed to such an extent that it impaired the applicant's vision. The medical experts were unable to give

an explanation for this growth. Dr. Ogilvie testified that in view of the size of the growth at the time it was removed coupled with the known facts concerning the rate of development of such growths the time element would be about right for the growth to have had its origin around the time of the accident. Dr. Fairbanks testified that he believed the blow caused the sarcoma and his testimony is susceptible of the interpretation that this belief was based on his own observations although it found no support in the literature. When all of these factors are considered together it makes an extremely close case—one very close to the border-line. The commission resolved the doubt in favor of the applicant. We have previously adhered to the rule that doubts respecting the right to compensation should be resolved in favor of the employee or his dependents. *Park Utah Consolidated Mines* v. *Industrial Comm.*, 84 Utah 481, 36 P. 2d 979; *Ogden City* v. *Industrial Comm.*, 57 Utah 221, 193 P. 857; *Chandler* v. *Industrial Commission*, 55 Utah 213, 184 P. 1020, 8 A. L. R. 930. We have considerable doubt as to whether in this case the applicant has carried his burden of proof. Certainly the Commission could have readily found the other way, but we are not prepared to say that they, on this evidence, were compelled to so find. We therefore sustain the award of the Industrial Commission. Such is the order.

McDONOUGH, MOFFAT, and WADE, JJ., concur.

LARSON, Justice.

I concur. As appears from the testimony in the case, the relationship or connection between injury (trauma) and cancer is not well established in the medical world. There is much medical and legal evidence that certain substances acting on the body over a period of time may produce tumors, both benign and malignant. But there is only a reasoning process, post hoc ergo propter hoc, to establish that a single mechanical trauma can produce a cancer.

Ewing, in his article on The Relation of Trauma to Malignant Tumors, 40 Am. J. Surgery 30, discusses the minimal criteria necessary for such conclusions. I summarize them: First it must be established that prior to the injury the site of the tumor was not affected; second, the injury must be so severe as to break the continuity of the tissue and so require proliferation of cells; third, the tumor must appear in a reasonable length of time; fourth, the tumor must be of a type which might reasonably develop as a result of the regeneration of the tissues which received the injury. A conclusion from these minimal conditions may be further supported by bridging symptoms which give evidence of the continuance of disability from the time of the injury to the time of the tumor, such as a continuity of pain, swelling, hardening of the injured part, and ulceration. See also Handbuchder Unfallenkrenkungen by Thein, p. 598.

All of these criteria appear to have been met in the instant case, and the Commission could properly draw the inference it did.